UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROSA ZAYAS, *as Parent and Natural Guardian of R.Z.*; ROSA ZAYAS, *individually*; EDWIN ZAYAS, *as Parent and Natural Guardian of R.Z.*; and EDWIN ZAYAS, *individually*,

Plaintiffs,

-v.-

DAVID C. BANKS, *in his official capacity as Chancellor of New York City Department of Education*, and NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendants.

22 Civ. 7112 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiffs Rose and Edwin Zayas ("Plaintiffs"), individually and as parents and natural guardians of their son, R.Z., bring this motion for summary judgment, seeking a judicial determination that Defendants David C. Banks (in his official capacity as Chancellor of the New York City Department of Education) and the New York City Department of Education (together, "DOE" or "Defendants") failed to offer R.Z. a free appropriate public education ("FAPE") for the 2021-2022 school year, as mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485.  Plaintiffs also seek a determination that their unilateral placement of R.Z. at the International Institute of the Brain ("iBRAIN") for the 2021-2022 school year was appropriate and that equitable considerations warrant reimbursement of Plaintiffs for the total cost of R.Z.'s attendance thereat.  In so moving, Plaintiffs appeal from the contrary decision of State Review Officer ("SRO") Justyn Bates, which decision

concluded the underlying state administrative proceedings in this dispute. Defendants cross-move for summary judgment, asking this Court to affirm the decision of SRO Bates. For the reasons discussed herein, the Court grants Defendants' motion and denies Plaintiffs' motion, both in full.

**BACKGROUND**[1]

**A.     Factual Background**

**1.     The State's Obligation to Provide a FAPE under IDEA**

Under IDEA, the federal government provides funding to states in support of special education programs and services for children with disabilities. *See generally* 20 U.S.C. §§ 1411-1419. To receive federal funding pursuant to IDEA, a state must submit a plan to the Secretary of Education "that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that" a FAPE is available to all children with disabilities residing in the State. 20 C.F.R. § 300.100.

In furtherance of this mandate, IDEA requires each state to identify all children in their state with disabilities requiring special education programs

---

[1]     The facts set forth in this Opinion are drawn from the parties' submissions in connection with the parties' cross-motions for summary judgment. The Court primarily sources facts from Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1" (Dkt. #18)) and Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #30)), as well as the Complaint ("Compl." (Dkt. #1)).

For ease of reference, the Court refers to Plaintiffs' memorandum of law in support of their motion for summary judgment as "Pl. Br." (Dkt. #20); to Defendants' memorandum of law in opposition to Plaintiffs' motion and in support of their cross-motion for summary judgment as "Def. Br." (Dkt. #32); and to Plaintiffs' memorandum of law in further support of their motion and in opposition to Defendants' cross-motion as "Pl. Reply" (Dkt. #38). The Court refers to the decisions of the Impartial Hearing Officer ("IHO") and the State Review Officer ("SRO") in the underlying administrative proceedings as "IHO Decision" (Dkt. #1-1) and "SRO Decision" (Dkt. #1-2), respectively.

and services and develop an appropriate "individualized education program" ("IEP") for each child.  20 U.S.C. § 1412(a)(3)-(4).  New York law defines an IEP as "a written statement … which includes the [programs and services] … to be provided [by the state] to meet the unique educational needs of a student with a disability."  N.Y. COMP. CODES R. & REGS. tit. 8, § 200.1(y); *see also id.* § 200.4(d)(2) (describing the components of an IEP).  A child's IEP is reviewed and, if necessary, revised on a periodic (but no less than annual) basis.  20 U.S.C. § 1414(d)(4)(A).

In New York State, IEPs are developed by Committees on Special Education ("CSEs"), which are convened by the board of education or trustees of the school district in which each covered student resides.  N.Y. EDUC. LAW § 4402(1)(b)(1).  Each CSE is a "multidisciplinary team" of people, N.Y. COMP. CODES R. & REGS. tit. 8, § 200.1(z), that evaluates and places a covered student in appropriate special educational programming, N.Y. EDUC. LAW § 4402(1)(b)(1).  Generally speaking, a CSE comprises the student's parents, regular education teacher, special education teacher, and school psychologist, among others.  *Id.* § 4402(1)(b)(1)(a).  In determining the student's educational needs, the CSE will "obtain, review[,] and evaluate all relevant information," including, where appropriate, "assessments … necessary to ascertain the physical, mental, emotional[,] and cultural-educational factors which may contribute to his suspected or identified disability[.]"  *Id.* § 4402(1)(b)(1)(d)(3)(a). By federal regulation, a CSE must take into consideration the concerns of a

student's parents as it formulates that student's IEP.  34 C.F.R.
§ 300.324(a)(1)(ii).

If a CSE finds that it needs more information to determine a student's
needs, it may direct the student to undergo a supplementary assessment
conducted by an appropriately qualified professional.  N.Y. COMP. CODES R. &
REGS. tit. 8, §§ 200.4(b)(3), (5).  Similarly, parents who wish to provide
additional information to a CSE may request an Independent Educational
Evaluation ("IEE").  *Id.* § 200.5(g).  An IEE is "an individual evaluation of a
student with a disability," conducted at public expense "by a qualified
examiner who is not employed by the public agency responsible for the
education of the student," for the purposes of collecting additional information
about the student's abilities.  *Id.* § 200.1(z).  The results of an IEE "must be
considered by [a] school district … in any decisions made with respect to the
provision of a [FAPE] for the student," and "may be presented by any party as
evidence at an impartial hearing for that student."  *Id.* § 200.5(g)(1)(vi)(a)-(b).

### 2.    Development of R.Z.'s IEP for the 2021-2022 School Year

R.Z., the son of Plaintiffs Rosa and Edwin Zayas, suffers from cerebral
palsy, seizure disorder, hydrocephalus, dystonia, and global developmental
delay, in addition to being legally blind, non-ambulatory, nonverbal, and
having a shunt and a gastronomy tube.  (Pl. 56.1 ¶¶ 1, 3-4).  During the events
that precipitated this action, R.Z. was sixteen or seventeen years old.  (*Id.* ¶ 2).
Due to R.Z.'s neurophysical limitations, he cannot care for himself
independently and is fully dependent on others in all activities of daily living.

(*Id.* ¶¶ 4, 6).  He communicates only through vocalization, facial expressions, body movements, and eye gazing.  (*Id.* ¶ 5).  Accordingly, he is incapable of learning on a typical academic trajectory.  (*Id.* ¶ 6).

In March 2021, a CSE was convened to conduct an evaluation of R.Z. (the "March 2021 CSE").  (Pl. 56.1 ¶ 10).  Specifically, the March 2021 CSE was tasked with formulating an IEP for R.Z. for the upcoming 2021-2022 school year (the "2021-2022 IEP").  (*Id.*).  As initially drafted, the 2021-2022 IEP recommended for R.Z., *inter alia*:

- Enrollment in a 12-month program in a 6:1:1 class at a District 75 ("D75") school (Def. 56.1 ¶ 3);[2]

- Occupational therapy (four times weekly for sixty minutes), physical therapy (five times weekly for sixty minutes), speech language therapy (five times weekly for sixty minutes), and vision education services (three times weekly for sixty minutes) (*id.* ¶ 4);

- Full-time individual health paraprofessional services and individual assistive technology services (once weekly for sixty minutes) (*id.*); and

- Special transportation accommodations, including a 1:1 nursing service and oxygen, transportation from the nearest curb location to school, and a wheelchair lift bus (*id.* ¶ 5).

---

[2]   "6:1:1" refers to the ratio of students to teachers and paraprofessionals.  *See Navarro Carrillo* v. *N.Y.C. Dep't of Educ.*, No. 21-2639, 2023 WL 3162127, at *1 n.1 (2d Cir. May 1, 2023), *cert. denied sub nom. Carrillo* v. *NYC Dep't of Educ.*, No. 23-461, 2024 WL 71995 (U.S. Jan. 8, 2024).

District 75 "provides highly specialized instructional support for students with significant challenges, such as: Autism Spectrum Disorders[,] Significant cognitive delays[,] Emotional disabilities[,] Sensory impairments[, and] Multiple disabilities." Special Education District 75, http://schools.nyc. gov/Offices/District75/default.htm (last visited Jan. 13, 2024).

Consistent with the 2021-2022 IEP, Defendant DOE placed R.Z. in the Horan School, a D75 school where he could be placed in a 6:1:1 classroom. (*Id.* ¶ 7). DOE informed Plaintiffs of this placement by letters dated March 16, 2021, and May 27, 2021. (*Id.*).

In May and June 2021, R.Z. underwent a neuropsychological IEE conducted by Dr. Isabel Rodriguez (the "Rodriguez IEE"). (Def. 56.1 ¶ 12). Importantly, the Rodriguez IEE was ordered as a result of a prior proceeding between the parties, *i.e.*, it was not conducted at the direction of the March 2021 CSE. (*Id.*). Based on her evaluation of R.Z., Dr. Rodriguez recommended that R.Z. attend iBRAIN instead of a D75 school. (*Id.* ¶¶ 13-14). According to Dr. Rodriguez, "D75 Programs often include[] children with Autism Spectrum diagnoses, a clinical presentation that requires different academic and supportive needs than those needed of a child [like R.Z.] with an acquired brain injury." (*Id.* ¶ 14). For this reason, iBRAIN — where Plaintiff attended school during the 2020-2021 school year — was a more appropriate placement. (Pl. 56.1 ¶¶ 9, 21).

Also in June 2021, R.Z. underwent an assistive technology evaluation (the "AT Evaluation"). (Def. 56.1 ¶ 11). Unlike the Rodriguez IEE, the AT Evaluation was conducted at the request of the March 2021 CSE to inform potential amendments to the 2021-2022 IEP. (*Id.* ¶¶ 11, 23). The AT Evaluation concluded that R.Z. faced significant challenges in all areas of communication, but acutely in expressive language. (*Id.* ¶ 11). To alleviate

these difficulties, the AT Evaluation recommended that R.Z. be provided with a dynamic display speech generating device. (*Id.*).

By letter dated June 23, 2021, Plaintiffs informed DOE that they disagreed with the 2021-2022 IEP's recommended placement of R.Z. at a D75 school. (Def. 56.1 ¶ 10). Plaintiffs further indicated their intent to unilaterally enroll R.Z. at iBRAIN for the 2021-2022 school year. (*Id.*). On July 2, 2021, Plaintiffs executed a contract with iBRAIN for the 2021-2022 school year. (*Id.* ¶ 16). During this time, Plaintiffs neither provided the Rodriguez IEE to the March 2021 CSE nor requested that the CSE reconvene in light of the Rodriguez IEE. (*Id.* ¶ 15).

On August 19, 2021, the March 2021 CSE reconvened (the "August Meeting"). (Def. 56.1 ¶ 17). Despite multiple emails and at least one telephone call notifying them of the August Meeting — which notifications Plaintiffs claimed they were not aware of until after the meeting — Plaintiffs were not in attendance. (*Id.* ¶¶ 18-20; *see also* Pl. 56.1 ¶¶ 24-28). At the August Meeting, the March 2021 CSE re-evaluated the 2021-2022 IEP in light of the results of the AT Evaluation conducted in June (but not the Rodriguez IEE, which those in attendance had not received). (Def. 56.1 ¶ 23). Among other changes, the March 2021 CSE (i) amended the 2021-2022 IEP to provide R.Z. with a dynamic display speech generating device, in accordance with the recommendations of the AT Evaluation, and (ii) changed R.Z.'s disability classification from "Traumatic Brain Injury" to "Multiple Disabilities." (*Id.* ¶ 24). The recommendation that R.Z. attend a D75 school remained.

**B.     Procedural Background**

**1.     Administrative Proceedings**

On October 7, 2021, Plaintiffs filed a Due Process Complaint requesting a due process hearing in front of an Impartial Hearing Officer ("IHO") on the basis that DOE failed to offer R.Z. a FAPE for the 2021-2022 school year.  (Pl. 56.1 ¶ 33).  IHO Diane Ciccone presided over three hearings between November 8, 2021, and December 14, 2021.  (Def. 56.1 ¶ 26).  On February 9, 2022, IHO Ciccone issued a decision in Plaintiffs' case, finding that (i) DOE failed to offer R.Z. a FAPE for the 2021-2022 school year; (ii) the equities favored Plaintiffs' request for funding of the unilateral placement at iBRAIN for the 2021-2022 school year; (iii) Plaintiffs were entitled to transportation costs to and from iBRAIN for the 2021-2022 school year; and (iv) the appropriate disability classification for R.Z. was "traumatic brain disorder" and his IEP should be amended to reflect that classification (the "IHO Decision").  (IHO Decision 16-17; Pl. 56.1 ¶¶ 37-42).  IHO Ciccone ordered DOE to compensate Plaintiffs for the base tuition at iBRAIN for the 2021-2022 school year, among other costs of attendance.  (IHO Decision 17; Def. 56.1 ¶ 28).

Soon after, DOE filed a Verified Request for Review with the New York State Department of Education's Office of State Review, seeking a reversal of IHO Ciccone's finding that DOE failed to offer R.Z. a FAPE for the 2021-2022 school year and an annulment of the corresponding money award.  (Def. 56.1 ¶ 29).  On April 20, 2022, State Review Officer ("SRO") Justyn Bates issued his decision reversing that of IHO Ciccone (the "SRO Decision").  (*Id.* ¶ 31).  SRO

8

Bates found that DOE had provided R.Z. with a FAPE for the 2021-2022 school

year and accordingly reversed "those portions [of the IHO Decision] which

determined that [DOE] failed to offer [R.Z.] a FAPE for the [20]21-[20]22 school

year, ordered funding of [R.Z.'s] unilateral placement at iB[RAIN] and

transportation [thereto] … for the 2021-[20]22 school year, and found that

[R.Z.]'s IEP should reflect an eligibility classification of TBI." (SRO Decision

30).

### 2. Proceedings in This Court

Plaintiffs commenced the instant action on August 19, 2022, by filing a

Complaint seeking this Court's review of the SRO Decision. (*See generally*

Compl.). Defendants filed their Answer on November 14, 2022. (Dkt. #13). On

February 2, 2023, Defendants filed a letter with the Court "respectfully

suggest[ing]" that, "[b]ecause the allegations in the Complaint concern an

underlying administrative hearing," "no discovery, apart from the certified

record, is required in this action." (Dkt. #16 at 1-2). For this reason, in lieu of

proceeding to discovery, "[t]he parties intend[ed] to file cross-motions for

summary judgment to resolve the issues in this action." (*Id.* at 2). The Court

thereafter adopted the parties' proposed briefing schedule on their cross-

motions for summary judgment. (Dkt. #17).

On April 3, 2023, Plaintiffs filed their motion for summary judgment and

accompanying Rule 56.1 statement of material facts. (Dkt. #18-20). On

June 2, 2023, Defendants filed their cross-motion for summary judgment and

opposition to Plaintiffs' motion for summary judgment; Rule 56.1 statement of

material facts; and responses to Plaintiffs' Rule 56.1 statement of material facts.  (Dkt. #29-32).  On July 3, 2023, Plaintiffs filed their opposition to Defendants' cross-motion for summary judgment, reply in further support of their motion for summary judgment, and responses to Defendants' Rule 56.1 statement of material facts.  (Dkt. #33-34).  Finally, on August 5, 2023, Defendants filed their reply in further support of their cross-motion for summary judgment.  (Dkt. #38).

## DISCUSSION

### A.   Applicable Law

#### 1.   Deference to Administrative Findings

IDEA enables a party aggrieved by an SRO's findings to bring a civil action challenging such findings in state or federal court.  20 U.S.C. § 1415(i)(2)(A).  When such an action is brought in federal court, "the parties and the court typically style the decision as a ruling on a motion for summary judgment, but 'the procedure is in substance an appeal from an administrative determination, not a summary judgment motion.'"  *Bd. of Educ. of Yorktown Cent. Sch. Dist.* v. *C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (quoting *M.H.* v. *N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012)).  The court thus "engage[s] in an independent review of the administrative record and make[s] a determination based on a preponderance of the evidence."  *M.H.*, 685 F.3d at 240 (internal quotation marks omitted).  Nonetheless, the court "must give due weight to [the state administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and policy experience necessary to

resolve … difficult questions of educational policy." *Id.* (internal quotation marks omitted).

Where an IHO and an SRO reach conflicting conclusions, the court's task is understandably more difficult. Generally speaking, the court must "defer to the final decision of the state authorities, that is, the SRO's decision." *R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks omitted). However, where there are conflicting IHO and SRO decisions, "the deference owed to [the] SRO's decision depends on the quality of that opinion." *Id.* An SRO's decision warrants greater deference when it is, *e.g.*, a decision "regarding the substantive adequacy of an IEP," as opposed to a decision "concerning whether the IEP was developed according to the proper procedures"; a decision "grounded in thorough and logical reasoning"; or a decision "based entirely on the same evidence as that before [the district court]." *M.H.*, 685 F.3d at 244. In sum, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189.

### 2. The *Burlington/Carter* Test for Tuition Reimbursement

In 1985, the Supreme Court of the United States recognized the right of parents who disagree with their child's proposed IEP to unilaterally withdraw their child from public school and place her in private school. *Sch. Comm. of Town of Burlington, Mass.* v. *Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). The Court further held that IDEA authorizes a district court to order school

11

authorities to retroactively reimburse parents for the cost of tuition at that private school, should the court determine that the "private placement desired by the parents was proper under [IDEA] and that an IEP calling for placement in a public school was inappropriate." *Id.* at 366-67. In 1993, the Court expanded upon the *Burlington* decision, holding that a parents' private placement need not meet all of the requirements of IDEA to qualify for reimbursement, so long as the placement is otherwise "proper" under IDEA. *Florence Cnty. Sch. Dist. Four* v. *Carter By & Through Carter*, 510 U.S. 7, 10 (1993).

The Court's decisions in these two cases spawned the *Burlington/Carter* test, which governs claims seeking tuition reimbursement under IDEA. *See C.F. ex rel. R.F.* v. *N.Y.C. Dep't of Educ.*, 746 F.3d 68, 76 (2d Cir. 2014). Under the *Burlington/Carter* test, a district court may order the state to reimburse the parents of a child who was unilaterally placed in private school if: "[i] the [state agency]'s proposed placement violated [] IDEA, [ii] the parents' alternative private placement was appropriate, and [iii] equitable considerations favor reimbursement." *T.M. ex rel. A.M.* v. *Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014); *accord Neske* v. *N.Y.C. Dep't of Educ.*, No. 22-2962-cv, 2023 WL 8888586, at *1 (2d Cir. Dec. 26, 2023) (summary order). Under New York's Education Law § 4404(1)(c), DOE bears the burden of establishing the initial prong, while the student's parents bear the burden on the second and third prongs. *R.E.*, 694 F.3d at 184-85.

Importantly, if a court determines that the state agency's proposed placement did not violate IDEA — *i.e.*, if it finds in the negative on the first prong — "it need not consider the remaining two prongs of the *Burlington-Carter* test." *P.K. ex rel. S.K.* v. *N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 104 (E.D.N.Y. 2011), *aff'd, appeal dismissed*, 526 F. App'x 135 (2d Cir. 2013) (summary order); *accord M.C. ex rel. Mrs. C.* v. *Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000).

### 3.    Free Appropriate Public Education

The Supreme Court first analyzed the meaning of IDEA's requirement of a "free appropriate public education" in its decision in *Board of Education of Hendrick Hudson Central School District, Westchester County* v. *Rowley*.  458 U.S. 176, 187-88 (1982) ("Like many statutory definitions, this one tends toward the cryptic rather than the comprehensive[.]").  The Court explained that "the 'basic floor of opportunity' provided by [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201.  Thus, under IDEA, provision of a FAPE requires "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203.

The Second Circuit, continuing the Supreme Court's endeavor to elucidate the necessary elements of a FAPE, has held that a student's IEP "must include special education and related services tailored to meet the unique needs of [the] particular child[] and be reasonably calculated to enable

13

the child to receive educational benefits" to provide a FAPE. *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted). "A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *A.C. ex rel. M.C.* v. *Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 173 (2d Cir. 2009) (alterations adopted) (internal quotation marks omitted). A FAPE does not, however, entail "everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132; *see also J.R.* v. *N.Y.C. Dep't of Educ.*, 748 F. App'x 382, 386 (2d Cir. 2018) (summary order).

**B.    Analysis**

Before the Court are the parties' cross-motions for summary judgment. As noted above, Plaintiffs seek a reversal of the SRO Decision and an order finding that (i) Defendants failed to offer R.Z. a FAPE for the 2021-2022 school year; (ii) R.Z.'s unilateral placement at iBRAIN was appropriate; (iii) the equitable considerations weigh in favor of Plaintiffs; and (iv) Plaintiffs are entitled to reimbursement of the total cost of R.Z.'s educational placement, including tuition, special transportation, and nursing services, as well as any such other relief this Court deems just, equitable, and proper. (Pl. Br. 1, 4). Conversely, Defendants ask the Court to conclude that they did not deny R.Z. a FAPE and affirm the SRO Decision. (Def. Br. 1).

This Court, applying the *Burlington/Carter* test, affirms the SRO Decision. That is, the Court finds that DOE's placement of R.Z. at the Horan

School did not violate IDEA, and as such Plaintiffs are not entitled to reimbursement of the costs of R.Z.'s private placement at iBRAIN.  Because the Court concludes that DOE's proposed placement did not violate IDEA (the first prong of the *Burlington*/*Carter* test), it need not evaluate whether Plaintiffs' private placement of R.Z. at iBRAIN was appropriate or whether equitable considerations favor Plaintiffs' reimbursement (the second and third prongs, respectively).

### 1.    The Decision of SRO Bates Merits Deference

As an initial matter, the Court finds that the SRO Decision is owed substantial deference.  *See Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 113 (2d Cir. 2007) ("[F]ederal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." (alterations adopted) (internal quotation marks omitted)).  Because the IHO Decision and the SRO Decision in this case are in conflict, the Court must in the first instance defer to the SRO Decision, which represents "the final decision of the state authorities[.]"  *Karl by Karl* v. *Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984).  That said, the Court may afford the SRO Decision diminished weight if and to the extent that it was "inadequately reasoned, in which case a better-reasoned IHO Decision may be considered instead."  *R.E.*, 694 F.3d at 189.

Plaintiffs, unsurprisingly, take the position that the SRO Decision warrants no deference.  In particular, Plaintiffs claim that the SRO Decision is

"not well-reasoned" because, among other things, SRO Bates "discounted Dr. Rodriguez's testimony and effectively substituted his own opinion for [that of] an expert." (Pl. Reply 5). But, as Defendants note, SRO Bates carefully evaluated the testimony of Dr. Rodriguez and logically concluded that it "should be given little probative weight[,] [as] Dr. Rodriguez did not visit iBRAIN or the assigned D75 placement for R.Z. [and] had no specific information about the students with whom R.Z. would have been placed." (Def. Br. 15 (internal quotation marks and citations omitted)). And on this point, it bears noting that Plaintiffs deem IHO Ciccone's contrary opinion — which credits Dr. Rodriguez's testimony — "arbitrary and capricious and [also] deserv[ing of] no deference from this Court," as to those issues upon which IHO Ciccone was adverse to Plaintiffs. (Pl. Reply 12).

More to the point, as Defendants note, SRO Bates "issued a 27-page [(single-spaced)] decision, in which he … carefully and thoroughly examined the record[.]" (Def. Br. 12). Indeed, to support his conclusion regarding the 2021-2022 IEP, SRO Bates analyzed a variety of documentary and testimonial evidence from the IHO hearings and the underlying CSE meetings, discussing in depth, *e.g.*, a report prepared by iBRAIN (SRO Decision 16), the testimony of the placement school's psychologist (*id.* at 21), an assistive technology evaluation conducted in June 2021 (*id.* at 24), the testimony of the assistant principal of the placement school (*id.* at 26), and the testimony of

neuropsychologist Dr. Rodriguez (*id.* at 29).[3]  Accordingly, the Court finds it appropriate to defer to the SRO Decision.  *See Walczak*, 142 F.3d at 129 ("Deference is particularly appropriate when, as here, the [SRO's] review has been thorough and careful.").

### 2.    The 2021-2022 IEP Did Not Violate IDEA

Finding that the decision of SRO Bates merits substantial deference, the Court proceeds to its "circumscribed" review of his conclusions that the 2021-2022 IEP did not deny R.Z. a FAPE and that Plaintiffs are not entitled to tuition reimbursement.  *Muller on Behalf of Muller* v. *Comm. on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 101 (2d Cir. 1998).  As previously discussed, the *Burlington/Carter* test for tuition reimbursement directs the district court to first assess "whether the [state]'s proposed placement violated the IDEA."  *T.M.*, 752 F.3d at 152.

This first prong has two further sub-steps.  "At the first step, courts examine … whether the state has complied with the procedures set forth in the

---

[3]    By contrast, after summarizing the formulation of the IEP and the arguments of the parties, IHO Ciccone offered only the following analysis:

> I find that the DOE failed to provide FAPE for this STUDENT for the 2021/2022 school year.

> I find the equities favor the parent's request for funding of the unilateral placement at PRIVATE SCHOOL from July 2021 to June 2022.

> I find the parent is entitled to transportation costs to and from school for the 2021/2022 school year.

> I find the appropriate classification for this STUDENT is traumatic brain disorder and the classification on the IEP should reflect the classification.

(IHO Decision 16).

IDEA." *R.E.*, 694 F.3d at 190 (internal quotation marks omitted).  Procedural violations only entitle parents to reimbursement if they "impeded the child's right to a free appropriate public education," "significantly impeded the parents' opportunity to participate in the decisionmaking process," or "caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).  At the second step, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits."  *R.E.*, 694 F.3d at 190 (alterations adopted) (internal quotation marks omitted).  "Substantive inadequacy automatically entitles the parents to reimbursement."  *Id.*

As described in the remainder of this section, the Court concludes that the 2021-2022 IEP was both procedurally and substantively adequate and, consequently, that it did not deny R.Z. a FAPE.

### a.    The 2021-2022 IEP Was Procedurally Adequate

IDEA sets forth a long list of "procedural safeguards" that each participating state must establish and maintain to ensure a FAPE is provided to its students.  *See generally* 20 U.S.C. § 1415; *see also Rowley*, 458 U.S. at 205 ("When the elaborate and highly specific procedural safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in [IDEA], we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.").  As just noted, a state's violation of these procedures does not automatically entitle a student's parents to tuition reimbursement; rather, such violation must "impede[] the

child's right to a free appropriate public education," "significantly impede[] the parents' opportunity to participate in the decisionmaking process," or "cause[] a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

In this case, only one procedural violation is cited by Plaintiffs: denial of their "meaningful participation" in the August Meeting of the March 2021 CSE. (Pl. Br. 13).  According to Plaintiffs, Defendants made "**no effort** to secure [Plaintiffs'] participation at the August [Meeting]."  (*Id.* at 14 (emphasis in original)).  Defendants, on the other hand, emphasize the fact that they emailed Plaintiff Edwin Zayas about the August Meeting a week prior to the meeting — which email, Plaintiff concedes, went into his junk folder — and, once the August Meeting was in progress, both called and emailed Plaintiff to invite him to participate.  (Def. Br. 16-17).

Importantly, IDEA, its implementing regulations, and the New York Education Law all mandate parent participation in the development of a child's IEP.  *See, e.g.*, 20 U.S.C. § 1415(b)(1) (requiring "[a]n opportunity for the parents of a child with a disability ... to participate in meetings with respect to the identification, evaluation, and educational placement of the child"); 34 C.F.R. § 300.501(b)(2) (requiring public agencies to "provide notice . . . to ensure that parents of children with disabilities have the opportunity to participate in meetings" regarding their child's educational placement); N.Y. COMP. CODES R. & REGS. tit. 8, § 200.5(a)(1) (mandating "[p]rior written notice ... be given to the parents of a student with a disability a reasonable time before the school district proposes to or refuses to initiate or change the identification,

19

evaluation, [or] educational placement of the student"). In particular, IDEA requires public agencies to "take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate" including by "[n]otifying parents of the meeting early enough to ensure that they will have an opportunity to attend" and "[s]cheduling the meeting at a mutually agreed on time and place." 34 C.F.R. § 300.322(a).

It is quite clear that there was at least one procedural violation in this case. Setting aside the issue of whether Plaintiffs were adequately notified of the August Meeting, at a minimum, the meeting was not scheduled "at a mutually agreed on time and place," as is required by IDEA's implementing regulations. 34 C.F.R. § 300.322(a).[4] Still, in reversing the IHO Decision, SRO Bates explained that any procedural violation committed by Defendants in connection with the August Meeting did not amount to the denial of a FAPE because the changes made to the 2021-2022 IEP during the August Meeting were relatively inconsequential. (SRO Decision 18-19). That is, because Plaintiffs "actively participated in the March 2021 CSE meeting at which the majority of the program recommendations for [R.Z.] were formulated" (*id.* at 19), Plaintiffs' ability to "participate in the decisionmaking process" was not

---

[4]     The Court refrains from a detailed evaluation of the adequacy of Defendants' efforts to notify Plaintiffs of the August Meeting and takes no position as to whether their efforts fell short of that called for by federal and state regulations. Because, as explained in the text, any procedural violation did not "significantly impede" Plaintiffs' role in the decisionmaking process surrounding the 2021-2022 IEP, the notice dispute is not material to the outcome of the Court's determination of the procedural adequacy of the 2021-2022 IEP.

"significant[ly] imp[eded]" by their non-participation in the August Meeting, 20 U.S.C. § 1415(f)(3)(E)(ii).  For this reason, R.Z. could not have been denied a FAPE.  *Cf. T.K.* v. *N.Y.C. Dep't of Educ.*, 810 F.3d 869, 876 (2d Cir. 2016) (holding that IEP was procedurally inadequate and FAPE was denied where parents were denied meaningful participation in "two separate meetings, both of which were integral to the development of [their child]'s IEP").[5]

Consistent with the deference owed to the SRO's Decision, the Court credits SRO Bates's assessment of the import of Plaintiffs' absence from the August Meeting in light of the nature of the changes made to the 2021-2022 IEP during that meeting.  Accordingly, the Court affirms SRO Bates's conclusion that Plaintiffs' non-participation in the August Meeting did not "significantly impede" their role in the decisionmaking process surrounding the 2021-2022 IEP so as to result in the denial of a FAPE.

### b.    The 2021-2022 IEP Was Substantively Adequate

In addition to procedural adequacy, the first prong of the *Burlington*/*Carter* test also requires the Court to assess the substantive adequacy of the 2021-2022 IEP.  As previously noted, the Court's inquiry at this juncture is "whether the IEP … was reasonably calculated to enable the

---

[5]     The Court rejects Plaintiffs' argument that their non-participation in the August Meeting rose to the denial of a FAPE because "if the Plaintiffs had participated in the meeting, they could have presented to the CSE the report by Dr. Rodriguez … who evaluated R.Z. after the March 2021 CSE meeting, but whose report was completed before the August [M]eeting."  (Pl. Reply 8).  There is no evidence of any effort by Plaintiffs to provide the March 2021 CSE with the Rodriguez IEE or any call for the reconvention of the March 2021 CSE in light of it.   *See also* 34 C.F.R. § 300.324(b) ("Each public agency must ensure that … the IEP Team … [r]evises the IEP, as appropriate, to address … [i]nformation about the child provided to, or by, the parents[.]").

child to receive educational benefits." *R.E.*, 694 F.3d at 190 (alterations adopted) (internal quotation marks omitted).

Plaintiffs claim three substantive deficiencies in the 2021-2022 IEP. *First*, according to Plaintiffs, the 2021-2022 IEP's assigned public school site, the Horan School, "inappropriately grouped R.Z. with differently abled peers." (Pl. Br. 11). *Second*, the 2021-2022 IEP failed to include a recommendation for music therapy services. (*Id.* at 16).[6] *Third*, the 2021-2022 IEP inappropriately classified R.Z. as a student with "Multiple Disabilities," as opposed to a "Traumatic Brain Injury." (*Id.* at 14-15). The Court addresses each of Plaintiffs' challenges in turn.

Plaintiffs' principal substantive challenge to the 2021-2022 IEP concerns R.Z.'s placement at the Horan School, a D75 school, in a 6:1:1 class. Under New York State regulations, students in special education classes must be "grouped" with other students having similar individual needs. N.Y. COMP. CODES R. & REGS. tit. 8, §§ 200.1(ww)(3)(ii), 200.6(a)(3), (h)(3). Here, Plaintiffs assert that the 2021-2022 IEP's school placement inappropriately "grouped" R.Z. with differently-abled peers. Plaintiffs' challenge relies heavily upon the Rodriguez IEE's conclusion that "D75 programs often include children with autism spectrum disorder diagnoses, a clinical presentation that requires

---

[6]     Plaintiffs also list the failure to recommend "AT services" as a substantive deficiency of the 2021-2022 IEP in a section heading of their opening brief (*see* Pl. Br. 16 (titling Section II.4 of Plaintiffs' opening brief "DOE FAILED TO INCLUDE MUSIC THERAPY AND AT SERVICES"), but make no arguments in support of this contention in any of their submissions (*see generally* Pl. Br.; Pl. Reply). The Court accordingly considers the argument withdrawn.

different academic and supportive needs than those needed of a child with an acquired brain injury" (Pl. Reply 2), as well as Rodriguez's testimony at the underlying administrative hearings, which identified autistic children as possessing "stereotypical maladaptive behaviors which could place [R.Z.] in danger" (IHO Decision 13; *see also* Dkt. #27-3 at 99 (testimony of Dr. Rodriguez) ("I think there could be potential dangers … in a D75, because children who have autism, and particularly those who are severely autistic, tend to have stereotyped movements.")).  These observations led IHO Ciccone to conclude that "[s]ignificant safety issues involving other students" rendered "[R.Z.'s] placement in a D75 6:1:1 with children on the autism spectrum inappropriate."  (IHO Decision 14).

Conversely, Defendants argue that R.Z.'s assigned placement was capable of implementing the 2021-2022 IEP with appropriate functional grouping — *i.e.*, by placing R.Z. with other students having similar individual needs.  (Def. Br. 13).  According to Defendants, Plaintiffs' challenge is "impermissibly speculative," as there was no evidence that the Horan School could not implement R.Z.'s IEP with appropriate functional grouping.  (*Id.* at 14-15).  With respect to the testimony and findings of Dr. Rodriguez on which Plaintiffs rely, Defendants maintain that SRO Bates appropriately considered such materials and determined that they "should be given little probative weight."  (*Id.* at 15 (internal quotation marks omitted); *see* SRO Decision 29-30).

In the Second Circuit, "[s]peculation that [an assigned school] will not adequately adhere to [a child's] IEP is not an appropriate basis for unilateral placement" — and, in turn, tuition reimbursement — because the provision of a FAPE must be evaluated "prospectively." *R.E.*, 694 F.3d at 195. However, the Second Circuit does not bar all challenges to a proposed placement school's capacity to implement a child's IEP. For example, parents may challenge an assigned school's facial inability to satisfy a child's IEP. *M.O.* v. *N.Y.C. Dep't of Educ.*, 793 F.3d 236, 244-45 (2d Cir. 2015) ("To conclude otherwise would require parents to send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP, which is antithetical to [IDEA's] reimbursement process." (internal quotation marks omitted)). Parents may also mount what are, in truth, challenges to the substantive recommendations of a child's IEP, "couched" as challenges to an assigned school's capacity to provide IEP-mandated services. *Id.* ("[The child's parents] challenged [the placement school] on the grounds that … the student-teacher ratio was too large[;] … [this] challenge[] … do[es] not relate to [the school]'s capacity to implement the IEP; [it] relate[s] to the appropriateness of the IEP's substantive recommendations.")

Plaintiffs' challenge to R.Z.'s placement is precisely the kind of "speculative" challenge the Second Circuit declined to entertain in *M.O.* *See J.C.* v. *N.Y.C. Dep't of Educ.*, 643 F. App'x 31, 33 (2d Cir. 2016) (summary order) ("[G]rouping evidence is not the kind of non-speculative retrospective evidence that is permissible under *M.O.*"). As SRO Bates correctly explained,

R.Z. "never attended the assigned public school site[;] … [t]herefore, any claim that [R.Z.] would have been inappropriately grouped is impermissibly speculative."  (SRO Decision 27-28 ("[T]he IHO's reasoning was based on … speculation that students with autism might pose a danger to the student based on their physical and social differences and management needs and speculation regarding supposed differences in the academic and instructional programs both would require." (internal quotation marks omitted))).  Accordingly, Plaintiffs' grievance is not the kind of valid prospective challenge conceived of in *M.O.*, *i.e.*, a claim that "the [assigned] site is 'factually incapable' of implementing the IEP."  (*Id.* at 29).

Notwithstanding the impropriety of Plaintiffs' challenge, "for the sake of thoroughness," SRO Bates "review[ed] evidence in the hearing record regarding functional grouping" and concluded that the record "does not support the IHO's conclusion that the school was incapable of appropriately grouping [R.Z.]." (SRO Decision 28).  First, SRO Bates expressed misgivings about Dr. Rodriguez's testimony at the underlying administrative hearing, noting that "she had not visited the proposed classroom or school site in this case and had no specific information regarding the students in the proposed class, nor had she visited iB[RAIN]."  (*Id.* at 29).  SRO Bates further observed that Dr. Rodriguez's testimony was "rife with generalizations and unsupported hypotheticals about other classrooms, different years, and safety concerns, and stereotypes of students with different disability classifications," which speculation the SRO found to be "particularly unconvincing given that [Dr.

Rodriguez] did not conduct an observation of the proposed classroom[.]"  (*Id.* at 29-30).  SRO Bates's evaluation of Dr. Rodriguez's basis — or lack thereof — for her recommendations is borne out by the Court's own review of Dr. Rodriguez's testimony at the December 14, 2021 IHO hearing, which indicates that Dr. Rodriguez had not observed *any* D75 school in over two years.  (Dkt. #27-3 at 102 (testimony of Dr. Rodriguez)).

Next, SRO Bates reviewed the testimony of the Horan School's assistant principal.  (SRO Decision 28).  The assistant principal acknowledged that the "majority of the students in [the school's] 6:1:1 program [we]re students on the autism spectrum," but nonetheless affirmed the school's ability to implement the 2021-2022 IEP for R.Z. with respect to the class grouping.  (*Id.* (internal quotation marks omitted); *see also* Dkt. #27-3 at 199 (testimony of assistant principal) (Q: "[U]pon your review of [R.Z.'s] IEP, do you believe that the school could implement [R.Z.'s] IEP program?"  A: "Yes, I do.")).  All in all, SRO Bates concluded that there was "sufficient evidence to show that the assigned school would have been capable of implementing the [2021-2022] IEP with an appropriate functional grouping."  (*Id.* at 30).  Because the Court finds SRO Bates's reasoning to be more than adequately supported by the record, it affirms his conclusion that R.Z. was not denied a FAPE on the basis of his assigned public school site.

The second challenge Plaintiffs make to the substantive adequacy of the 2021-2022 IEP pertains to its failure to recommend music therapy.  According to Plaintiffs, "R.Z. suffers from cerebral palsy, which has been shown to benefit

tremendously from music therapy"; indeed, R.Z. is actively working on "[m]otor skill improvement," which is "one of the primary goals behind music therapy." (Pl. Br. 17).  For this reason, Plaintiffs maintain that Defendants could not have provided R.Z. with a FAPE absent a recommendation for music therapy.  (*Id.*). Defendants, on the other hand, argue that "the absence of music therapy did not deprive R.Z. of a FAPE because the goals underlying music therapy were addressed through other related services in [R.Z.]'s IEP."  (Def. Br. 19-20).

As previously noted, IDEA guarantees only an "appropriate education, not one that provides everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).  In other words, there are many interventions that "may help maximize [a child]'s potential, but [that] IDEA does not require."  *Bryant* v. *N.Y.S. Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012); *see also Rowley*, 458 U.S. at 199 ("[T]he furnishing of every special service necessary to maximize each handicapped child's potential is, we think, further than Congress intended to go [with IDEA].").

After a thorough review of the record, SRO Bates determined that music therapy was not required to provide R.Z. with a FAPE.  (SRO Decision 16-17). In doing so, he acknowledged that a report compiled by iBRAIN and considered by the March 2021 CSE recommended that R.Z. "receive two 60-minute sessions of music therapy[.]"  (*Id.* at 16).  Still, SRO Bates reasoned that "the [March 2021] CSE addressed the goals underlying the recommendation for music therapy services included in the iB[RAIN] school report through other

related services rather than by replicating iB[RAIN]'s music therapy approach."
(*Id.* at 17).  Indeed, as the Court's own investigation of the record reveals,
iBRAIN's director of special education testified at the December 14, 2021
hearing before IHO Ciccone that, even though she felt R.Z. could benefit from
additional services, she "[b]y and large" agreed with the slate of services
recommended by the March 2021 CSE.  (Dkt. #27-3 at 76).

Moreover, SRO Bates emphasized that music was not entirely absent
from the 2021-2022 IEP.  For example, the 2021-2022 IEP called for R.Z.'s
interests to be incorporated into his school day, and included music specifically
among the "age[-]appropriate activities and social opportunities" to which R.Z.
should be exposed.  (SRO Decision 17).  Affording deserved weight to the well-
reasoned judgment of SRO Bates regarding the necessity of music therapy to
the 2021-2022 IEP, the Court affirms the SRO's conclusion that the March
2021 CSE's failure to recommend music therapy did not amount to the denial
of a FAPE.  *See N.K.* v. *N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 592-93
(S.D.N.Y. 2013) (observing that "music therapy is not necessary to provide [the
student] a FAPE," where the relevant "IEP does not provide music therapy,
[but] does recommend that [the student] have access to music throughout the
day" (internal citations and quotation marks omitted)).

The third substantive challenge mounted by Plaintiffs concerns the
2021-2022 IEP's classification of R.Z.'s disability as "Multiple Disabilities."
Specifically, Plaintiffs claim that "Traumatic Brain Injury," and not "Multiple
Disabilities," "is the appropriate disability classification for R.Z. based on his

disabilities." (Pl. Br. 15). Further, Plaintiffs argue that Defendants "offered ***no***

***substantive reason***" for their decision to "chang[e] the disability classification

from ['Traumatic Brain Injury'] as reflected on [the initial draft of the 2021-

2022 IEP], to 'Multiple Disabilities' in August 2021." (*Id.* (emphasis in

original)). Defendants assert, on the other hand, that "R.Z.'s classification has

no bearing on whether the DOE provided him a FAPE," and thus that the

March 2021 CSE's alteration of R.Z.'s disability classification could not have

amounted to the denial of a FAPE. (Def. Br. 19).

IDEA specifies that the recommendations in a student's IEP may not rely

on the student's disability classification; rather, they must be based on the

student's unique educational needs. See 20 U.S.C. § 1412(a)(3); 34 C.F.R.

§ 300.304(c)(6); N.Y. COMP. CODES R. & REGS. tit. 8, § 200.4(b)(6)(ix). Indeed,

"CSEs are not supposed to rely on the disability category of a student in order

to determine her needs, goals, accommodations[,] and special education

services." *Carrillo* v. *Carranza*, No. 20 Civ. 4639 (CM), 2021 WL 4137663, at

\*15 (S.D.N.Y. Sept. 10, 2021), *aff'd sub nom. Navarro Carrillo* v. *N.Y.C. Dep't of

Educ.*, No. 21-2639, 2023 WL 3162127 (2d Cir. May 1, 2023) (summary order),

*cert. denied sub nom. Carrillo* v. *N.Y.C. Dep't of Educ.*, No. 23-461, 2024 WL

71995 (U.S. Jan. 8, 2024).

To that point, SRO Bates concluded that the March 2021 CSE's decision

to change R.Z.'s disability category "did not impact the goals, accommodations,

or special education services in [R.Z.'s] IEP and, therefore, had no impact on

[Defendants'] offer of a FAPE" to R.Z. (SRO Decision 22). SRO Bates explained

that, generally speaking, "when the student's eligibility for special education is not in dispute," a student's disability classification is minimally relevant to the development of her IEP.  (*Id.* at 20).  *See also B.D.* v. *Eldred Cent. Sch. Dist.*, 661 F. Supp. 3d 299, 315 (S.D.N.Y. 2023) ("The IEP would not change based on the specific disability classification and R.D., therefore, would receive the same education regardless.").  Since there was no dispute as to R.Z.'s eligibility for special education, "[his] classification becomes a distinction without a difference."  *Id.*

In support of this conclusion, SRO Bates cited the testimony of a district school psychologist, who stated that "the 13 disability classifications enumerated in State regulation d[o] not affect how a student was educated." (SRO Decision 21).  More to the point, the school psychologist explicitly testified that R.Z.'s disability classification "[did not] change anything in terms of the discussion that [the March 2021 CSE] ha[d] or the recommendations that [it] ma[de]."  (Dkt. #27-3 at 185).  As before, the Court finds the SRO Decision to be both sufficiently reasoned and supported by the record with respect to its conclusion regarding R.Z.'s disability classification and adopts it herein.

In sum, like their procedural challenge, Plaintiffs' three substantive challenges to the 2021-2022 IEP fail to convince the Court that Defendants denied R.Z. a FAPE for the 2021-2022 school year.  Correspondingly, the Court finds that the 2021-2022 IEP did not violate IDEA, and that Plaintiffs fall short of satisfying the first prong of the *Burlington*/*Carter* test.  Plaintiffs therefore

fail to clear the threshold required to proceed to the remaining prongs of the *Burlington/Carter* analysis. *P.K. ex rel. S.K.*, 819 F. Supp. 2d at 104 (noting that where a court has determined that the state agency's proposed placement did not violate IDEA, "[the court] need not consider the remaining two prongs of the *Burlington-Carter* test"). Accordingly, the Court affirms the SRO Decision in full and concludes that Plaintiffs are not entitled to tuition reimbursement under *Burlington/Carter*.

## CONCLUSION

Based upon the foregoing analysis, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendants' cross-motion for summary judgment, both in full.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      January 19, 2024
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge